**IN THE UNITED STATES DISTRICT COURT FOR THE**

**WESTERN DISTRICT OF OKLAHOMA**

FILED

MAY 0 5 2026

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____ _____, DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. **CR-26-156-J** |
| | ) | |
| MATTHEW MCLAIN VEAZEY, | ) | **Violations:** 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1957(a) |
| Defendant. | ) | 18 U.S.C. § 1028A |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| | ) | 18 U.S.C. § 982(a)(1) |
| | ) | 28 U.S.C. § 2461(c) |

## SUPERSEDING INDICTMENT

The Federal Grand Jury charges:

## Introduction

At all times relevant to this Superseding Indictment:

1.     **MATTHEW MCLAIN VEAZEY ("VEAZEY")** was, or claimed to be, a financial investment professional. **VEAZEY** lived in Dallas, Texas, until December 2022, when he moved to Oklahoma City, Oklahoma, where he currently resides.

2.     **VEAZEY** worked for an investment company located in Dallas, Texas, ("Investment Company 1") as an employee from in or about 2018 through in or about 2022. **VEAZEY** worked for Investment Company 1 as a consultant from in or about January 2023 through in or about June 2023. While working at Investment Company 1, **VEAZEY** worked on a private equity deal managed by Investment Company 1 ("PE Deal 1").

3.    **VEAZEY** inquired about working for another investment company located in Dallas, Texas ("Investment Company 2") in 2024. During employment discussions with Investment Company 2, **VEAZEY** learned about a private equity deal being developed by Investment Company 2 that had not yet closed ("PE Deal 2"). **VEAZEY** never went to work for Investment Company 2, and **VEAZEY** had no affiliation with or investment in PE Deal 2.

4.    **VEAZEY** solely owned and controlled a personal checking account at JPMorgan Chase Bank, N.A. ("Chase Bank") with account number XXXXX9270.

5.    **VEAZEY** solely owned and controlled a personal savings account at Chase Bank with account number XXXXX2409.

## COUNTS 1-21
### (Wire Fraud)

6.    The Federal Grand Jury incorporates paragraphs 1-5 by reference.

### The Scheme to Defraud

7.    From in or about June 2021 through at least in or about December 2025, in the Western District of Oklahoma and elsewhere,

-------------------------------- MATTHEW MCLAIN VEAZEY --------------------------------

knowingly and willfully devised, intended to devise, and executed a scheme and artifice to defraud others and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises. In particular, **VEAZEY** made false representations and promises to others that he would make investments on their behalf, that that they would participate in **VEAZEY**'s investments, or that **VEAZEY** would otherwise

2

direct the investment money to legitimate investments. Instead of using the money as promised, **VEAZEY** used the money for his own personal benefit and to support his lavish lifestyle.

### Manner and Means of the Scheme to Defraud

8.     It was part of the scheme to defraud that:

A.     **VEAZEY** held himself out as an experienced and successful financial investment professional.

B.     **VEAZEY** solicited investments from his friends and family (the "Investors"), people who trusted him and his professional experience, for purported investment opportunities. To induce the Investors to send him money, **VEAZEY** often represented that he had special access to investment opportunities with more favorable terms due to his connections and prior employment at investment companies.

C.     **VEAZEY** directed the Investors to send their investment money to his personal bank accounts at Chase Bank and made false representations and promises to the Investors that he had already made investments in which the Investors would participate, that he would make the investments on their behalf, or that he would otherwise direct the investment money to legitimate investments.

D.     **VEAZEY** kept the Investors' money for himself and used the money for his own personal use.

E.     Most of the Investors did not receive back any of their original investment money or any return on their investment.

3

F.    In total, the Investors transferred at least $2,385,500 into **VEAZEY**'s Chase Bank personal checking account (ending in 9270) and personal savings account (ending in 2409) over approximately 20 separate transactions as part of the investment fraud scheme.  **VEAZEY**, moreover, unsuccessfully attempted to defraud investors out of at least an additional $1,550,500.

**Execution of the Scheme to Defraud**

9.    <u>Victims 1 & 2</u>. In or about June 2021, **VEAZEY** solicited an investment from Victims 1 & 2, members of **VEAZEY**'s family who lived within the Western District of Oklahoma, for a "friends and family" investment opportunity at Investment Company 1. On or about July 29, 2021, Victim 1 sent $50,000 to **VEAZEY's** personal bank account to invest on their behalf.  **VEAZEY** did not make any investment on Victim 1 & 2's behalf and instead kept the money for himself.  **VEAZEY** has not paid back Victims 1 & 2 any of their original July 2021 investment money or provided any return.

10.    <u>Victim 3</u>. In or about January 2022, **VEAZEY** solicited an investment from Victim 3, a member of **VEAZEY**'s family, for an investment opportunity at Investment Company 1. On or about January 28, 2022, Victim 3 sent $75,000 to **VEAZEY's** personal bank account to invest on Victim 3's behalf.  **VEAZEY** did not make any investment on Victim 3's behalf and instead kept the money for himself.  **VEAZEY** has not paid back Victim 3 any of Victim 3's original investment money or provided any return.

11.    <u>Victim 4</u>. In or about May 2022, **VEAZEY** solicited an investment from Victim 4, an acquaintance of **VEAZEY**'s family, for an investment opportunity in PE Deal 1 through **VEAZEY**'s employment at Investment Company 1.  On or about June 1, 2022,

4

Victim 4 sent $500,000 to **VEAZEY**'s personal bank account to invest on Victim 4's behalf. **VEAZEY** did not make any investment on Victim 4's behalf. **VEAZEY** instead immediately sent $225,000 of Victim 4's money to Victim 5 to pay off an earlier loan **VEAZEY** had with Victim 5. **VEAZEY** kept the rest of Victim 4's money for himself. **VEAZEY** has paid back $30,000 to Victim 4 pursuant to a settlement agreement that resolved a lawsuit Victim 4 filed against **VEAZEY**. **VEAZEY** has otherwise not paid back Victim 4 any of Victim 4's original investment money or provided any return.

12.    Victim 5. Between in or about 2021 and in or about 2023, **VEAZEY** asked Victim 5, a former coworker and friend of **VEAZEY**, to make four capital loans into a landscaping company in Oklahoma City in which **VEAZEY** claimed to have a small ownership interest. For the final loan, in or about July 2023, **VEAZEY** sent Victim 5 a written loan agreement that provided for a fixed interest payment upon maturity. On or about July 11, 2023, Victim 5 sent $200,000 to **VEAZEY's** personal bank account to provide to the landscaping company as working capital. **VEAZEY** did not send the money to a landscaping company and instead kept the money for himself. **VEAZEY** has not paid back Victim 5 for the July 2023 loan or paid the agreed fixed interest.

13.    Victim 6. **VEAZEY** solicited multiple investments from Victim 6:

A.    In or about January 2024, **VEAZEY** pitched Victim 6, a member of **VEAZEY**'s family who lived in the Western District of Oklahoma, for an investment opportunity to which **VEAZEY** claimed to have special access with more favorable terms. In three transactions in or about January 2024, Victim 6 sent $150,000 to **VEAZEY's**

personal bank account to invest on Victim 6's behalf. **VEAZEY** did not make any investment on Victim 6's behalf and instead kept the money for himself.

B.    In or about March 2024, **VEAZEY** falsely claimed that one of the investments needed more capital and required more investment money from Victim 6. On or about March 7, 2024, Victim 6 sent $50,000 to **VEAZEY**'s personal bank account to increase the investment on Victim 6's behalf. **VEAZEY** did not use the money for any investment on Victim 6's behalf and instead kept the money for himself.

C.    In or about July 2024, **VEAZEY** falsely claimed the March 2024 investment created a tax issue for **VEAZEY**, and **VEAZEY** claimed he needed another $50,000 investment to solve the issue. On or about July 10, 2024, Victim 6 sent $50,000 to **VEAZEY**'s personal bank account to increase the investment on Victim 6's behalf. **VEAZEY** did not use the money for any investment on Victim 6's behalf and instead kept the money for himself.

D.    **VEAZEY** has not paid back Victim 6 any of Victim 6's original investment money or provided any return.

14.    <u>Victim 7</u>. In or about February 2024, **VEAZEY** solicited Victim 7, a friend and neighbor who lived within the Western District of Oklahoma, about investment opportunities in PE Deal 1 and PE Deal 2, to which **VEAZEY** claimed to have special access with more favorable terms. **VEAZEY** falsely claimed that he had himself invested $1,000,000 in PE Deal 1 and $1,000,000 in PE Deal 2 to induce Victim 7 to send **VEAZEY** money, when in fact **VEAZEY** had invested only $50,000 in PE Deal 1 and nothing in PE Deal 2. **VEAZEY** sent Victim 7 two fake wire confirmations that purported to show that

VEAZEY had invested $1,000,000 in each private equity deal. VEAZEY proposed that Victim 7 send him $1,000,000 to share in these two investments in a 50/50 split. Victim 7 declined to participate or send VEAZEY any money.

15.     Victim 8: VEAZEY solicited multiple investments from Victim 8:

A.     In or about April 2024, VEAZEY asked Victim 8, a family friend who lived within the Western district of Oklahoma, to invest in PE Deal 1 and PE Deal 2, to which VEAZEY claimed to have special access with more favorable terms. VEAZEY falsely claimed that he had himself invested $1,000,000 in PE Deal 1 and $1,000,000 in PE Deal 2 to induce Victim 8 to send VEAZEY money, when in fact VEAZEY had invested only $50,000 in PE Deal 1 and nothing in PE Deal 2. VEAZEY sent Victim 8 two fake wire confirmations via text message that purported to show that VEAZEY had in fact invested $1,000,000 in each private equity deal. On or about April 11, 2024, Victim 8 sent $200,000 to VEAZEY's personal bank account to participate in VEAZEY's purported investments in PE Deal 1 and PE Deal 2. VEAZEY kept Victim 8's investment money for himself.

B.     In or about June 2024, VEAZEY falsely claimed that a large investor in the two private equity deals needed to reallocate portions of the investments and that VEAZEY and Victim 8 needed to invest more money in them. VEAZEY falsely represented that he had invested another $500,000, and that Victim 8 needed to send VEAZEY another $50,000 as Victim 8's 10% share of the new investment. On or about June 21, 2024, Victim 8 sent $50,000 to VEAZEY's personal bank account to participate in the investment. VEAZEY kept Victim 8's investment money for himself.

7

C.      **VEAZEY** has not paid back Victim 8 any of Victim 8's original investment money or provided any return.

16.     Victim 9. **VEAZEY** solicited multiple investments from Victim 9:

A.      In or about December 2024, **VEAZEY** solicited Victim 9, a friend and neighbor of **VEAZEY** who lived within the Western District of Oklahoma, for an investment opportunity in PE Deal 2, to which **VEAZEY** claimed to have special access with more favorable terms.  **VEAZEY** falsely represented to Victim 9 that **VEAZEY** had invested $2,000,000 of his own money in PE Deal 2, and **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $1,000,000 investment in PE Deal 2 on December 9, 2024.   **VEAZEY** in fact had no affiliation with PE Deal 2 and had not invested any money in PE Deal 2.

B.      On or about January 14, 2025, **VEAZEY** sent Victim 9 a screenshot of an email that was purportedly sent by an executive of Investment Company 2, the sponsor and manager of PE Deal 2.  The email was titled "[PE Deal 2] Does Vegas" and was about a purported trip with high-profile investors in PE Deal 2 to Las Vegas.  The email was a fabrication created by **VEAZEY** to convince Victim 9 that **VEAZEY**'s investment in PE Deal 2 was real to induce Victim 9 to send **VEAZEY** money.

C.      On or about January 15, 2025, Victim 9 sent $300,000 to **VEAZEY**'s personal bank account to participate in **VEAZEY**'s purported investment in PE Deal 2. **VEAZEY** kept Victim 9's investment money for himself.

D.      In or about March 2025, **VEAZEY** falsely claimed that there was going to be a capital call for PE Deal 2.  **VEAZEY** falsely represented that he needed to

make an additional $800,000 investment in PE Deal 2, and that Victim 9 needed to send **VEAZEY** another $120,000 for Victim 9's 15% share of the new investment. **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $800,000 investment in PE Deal 2 on March 20, 2025.

E.    On or about March 26, 2025, **VEAZEY** sent Victim 9 a screenshot of a text message purportedly sent by G.H., who **VEAZEY** claimed was his financial advisor. The text message in the screenshot was fabricated by **VEAZEY.** In the screenshot, G.H. asked **VEAZEY** if Victim 9 could send his wire "today." **VEAZEY** sent the fake text message in which he impersonated G.H. to Victim 9 to pressure Victim 9 to send **VEAZEY** money.

F.    On or about March 26, 2025, after receiving the screenshot of the G.H. text message, Victim 9 sent $120,000 to **VEAZEY**'s personal bank account to further participate in **VEAZEY**'s purported investment in PE Deal 2. **VEAZEY** kept Victim 9's investment money for himself.

G.    In or about April 2025, **VEAZEY** solicited Victim 9 about an investment opportunity in PE Deal 1, to which **VEAZEY** claimed to have special access with more favorable terms. On or about May 12, 2025, **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $740,000 investment in PE Deal 1 on May 1, 2025. **VEAZY** told Victim 9 that Victim 9's 15% share would be $111,000. On or about May 16, 2025, Victim 9 sent $111,000 to **VEAZEY**'s personal bank account to participate in **VEAZEY**'s purported investment in PE Deal 1. **VEAZEY** kept Victim 9's investment money for himself.

H.      In or about July 2025, **VEAZEY** falsely claimed that the managers of PE Deal 1 were expanding the investment.  **VEAZEY** falsely claimed that he needed to make an additional $400,000 investment in PE Deal 1, and that Victim 9 needed to send **VEAZEY** another $60,000 for Victim 9's 15% share of the new investment.  **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $400,000 investment in PE Deal 1 on July 1, 2025.  On or about July 2 and July 3, 2025, Victim 9 sent $60,000 to **VEAZEY**'s personal bank account in two transfers to further participate in **VEAZEY**'s purported investment in PE Deal 1.  **VEAZEY** kept Victim 9's investment money for himself.

I.      Later in or about July 2025, **VEAZEY** solicited Victim 9 about a new investment opportunity that **VEAZEY** claimed he was able to invest in on favorable terms due to his connections: the "R.B.D. Deal."  **VEAZEY** falsely represented to Victim 9 that he invested $2,000,000 in the R.B.D. Deal, and **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** invested $2,000,000 in the R.B.D. Deal on July 16, 2025.  **VEAZEY** stated that Victim 9's 15% share would require a $300,000 investment.

J.      On or about July 21, 2025, and on or about August 6, 2025, Victim 9 sent $300,000 to **VEAZEY**'s personal bank account in two transfers to participate in **VEAZEY**'s purported investment in the R.B.D. Deal.  **VEAZEY** kept Victim 9's investment money for himself.

K.      On or about October 2, 2025, **VEAZEY** sent Victim 9 a screenshot purporting to show text messages between **VEAZEY** and G.H., **VEAZEY**'s purported

financial advisor. The text messages in the screenshot were fabricated by **VEAZEY**. In the screenshot, G.H. stated that he (G.H.) was given the "incorrect number" for the cost basis of the shares **VEAZEY** purchased in the R.B.D. Deal, and that **VEAZEY** needed to send another $330,000 for the shares purchased in the deal. On or about October 6, 2025, **VEAZEY** texted Victim 9 stating that he "had [G.H.] wire the $330k this morning to get that wrapped up." **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $330,000 investment in the R.B.D. Deal on October 6, 2025. Victim 9 agreed to send **VEAZEY** 15% of this investment.

L.    On or about October 14, 2025, Victim 9 sent $49,500 to **VEAZEY**'s personal bank account to further participate in **VEAZEY**'s purported investment in the R.B.D. Deal. **VEAZEY** kept Victim 9's investment money for himself.

M.    On or about October 23, 2025, **VEAZEY** sent Victim 9 a screenshot that purported to show a text message conversation between **VEAZEY** and J.P., a well-known senior investment professional at a prominent hedge fund. The text messages in the screenshot were fabricated by **VEAZEY**. In the screenshot, J.P. purportedly texted, "[c]an you hop on a call with PS and I? . . . Talking [PE Deal 1]. PS wants your take on next steps. . . . Thanks for the chat. PS and I agree completely." **VEAZEY** told Victim 9 the full name of PS, a well-known billionaire hedge fund founder and CEO, and continued, "[c]an't wait to hear how cool you think I am after you google him and [J.P.]." **VEAZEY** fabricated the conversation between himself and J.P. to convince Victim 9 that **VEAZEY** was a financial investment insider and that he was making a real and legitimate investment in PE Deal 1. In fact, at this time, **VEAZEY** was unemployed and his only source of

11

income throughout 2025 was the money he was receiving and spending from Victim 9's purported investments.

N.    On or about October 29, 2025, **VEAZEY** falsely claimed that PE Deal 1 was doing an "upsize" that required additional investment. **VEAZEY** falsely represented that he needed to invest an additional $800,000 in PE Deal 1, and that Victim 9's 15% share would be $120,000. **VEAZEY** sent Victim 9 a fake wire confirmation that purported to show that **VEAZEY** had made a $800,000 investment in PE Deal 1 on October 29, 2025.

O.    On or about October 29, 2025, Victim 9 sent $120,000 to **VEAZEY**'s personal bank account to further participate in **VEAZEY**'s purported investment in PE Deal 1. **VEAZEY** kept Victim 9's investment money for himself.

P.    In or about December 2025, **VEAZEY** solicited Victim 9 about two new purported investment deals that **VEAZEY** claimed he had access to as part of an investment group related to PE Deal 2: the N.A.H. Deal and the U. Deal. **VEAZEY** falsely represented that these new investments would be made through the same special purpose entity, controlled by Investment Company 2, that invested in PE Deal 2. On or about December 16, 2025, **VEAZEY** falsely represented that the investment group closed on both of the new deals, and he sent wires for both for a combined amount of $2,350,000. **VEAZEY** told Victim 9 his 15% share of the investment was $352,500.

Q.    On or about December 18, 2025, when asked for documentation for these new deals, **VEAZEY** sent Victim 9 a screenshot that purported to show a text message conversation between **VEAZEY** and S.T., an executive with Investment Company 2. The text messages in the screenshot were fabricated by **VEAZEY**. In the

12

screenshot, S.T. purportedly sent a text message to **VEAZEY** stating that S.T. would send executed versions of stock purchase agreements for the N.A.H. Deal and the U. Deal. In fact, Investment Company 2 had no affiliation with or investment in either the N.A.H. Deal or the U. Deal. **VEAZEY** impersonated S.T. to convince Victim 9 that the N.A.H. Deal and the U. Deal were real and legitimate investment opportunities.

R.    On or about December 18, 2025, Victim 9 attempted to send $352,500 to **VEAZEY**'s personal bank account for Victim 9's 15% share of the two new investments. On or about December 19, 2025, Chase Bank informed Victim 9 that it had blocked the $352,500 transfer due to a fraud alert.

### Wires in Furtherance of the Scheme to Defraud

17.    On or about the dates listed below, in the Western District of Oklahoma and elsewhere, **VEAZEY**, for the purposes of executing and attempting to execute the scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses and representations, with intent to defraud the Investors, caused the following interstate wire transmissions:

| Count | Approximate Date | Wire Description |
|---|---|---|
| 1 | July 29, 2021 | Transfer of $50,000 from Victim 1's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 2 | July 11, 2023 | Transfer of $200,000 from Victim 5's bank account to **VEAZEY**'s Chase Bank personal savings account number XXXXX2409. |

| Count | Approximate Date | Wire Description |
|---|---|---|
| 3 | January 10, 2024 | Transfer of $99,900 from Victim 6's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 4 | January 10, 2024 | Transfer of $100 from Victim 6's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 5 | January 12, 2024 | Transfer of $50,000 from Victim 6's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 6 | March 7, 2024 | Transfer of $50,000 from Victim 6's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 7 | April 10, 2024 | Text message sent by **VEAZEY** to Victim 8 with wire instructions for **VEAZEY**'s Chase Bank personal savings account number XXXXX2409. |
| 8 | April 11, 2024 | Transfer of $200,000 from Victim 8's bank account to **VEAZEY**'s Chase Bank personal savings account number XXXXX2409. |
| 9 | June 21, 2024 | Transfer of $50,000 from Victim 8's bank account to **VEAZEY**'s Chase Bank personal savings account number XXXXX2409. |
| 10 | July 10, 2024 | Transfer of $50,000 from Victim 6's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 11 | December 19, 2024 | Text message sent by **VEAZEY** to Victim 9 with wire instructions for **VEAZEY's** Chase Bank personal savings account number XXXXX2409. |

| Count | Approximate Date | Wire Description |
|---|---|---|
| 12 | January 15, 2025 | Transfer of $300,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal savings account number XXXXX2409. |
| 13 | March 25, 2025 | Text message sent by **VEAZEY** to Victim 9 with wire instructions for **VEAZEY's** Chase Bank personal checking account number XXXXX9270. |
| 14 | March 26, 2025 | Transfer of $120,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 15 | May 16, 2025 | Transfer of $111,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 16 | July 2, 2025 | Transfer of $30,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 17 | July 3, 2025 | Transfer of $30,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 18 | July 21, 2025 | Transfer of $50,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 19 | August 6, 2025 | Transfer of $250,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |
| 20 | October 14, 2025 | Transfer of $49,500 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |

| Count | Approximate Date | Wire Description |
|---|---|---|
| 21 | October 29, 2025 | Transfer of $120,000 from Victim 9's bank account to **VEAZEY**'s Chase Bank personal checking account number XXXXX9270. |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 22-27
### (Money Laundering)

18.     The Federal Grand Jury incorporates paragraphs 1–5 and 7–17 by reference

19.     Between in or about June 2021 and in or about December 2025, **VEAZEY** defrauded the Investors who believed they were making legitimate investments based on **VEAZEY**'s false statements and promises.  **VEAZEY** used the money he obtained from the Investors under fraudulent pretenses for his own personal use, including frequent large payments toward American Express and other credit cards that **VEAZEY** used to fund his lavish lifestyle.  The Investors transferred at least $2,385,500 into **VEAZEY**'s Chase Bank personal checking account (ending in 9270) and personal savings account (ending in 2409) over approximately 20 separate transactions as part of the investment fraud scheme.

20.     On or about the dates listed below, in the Western District of Oklahoma,

------------------------------ **MATTHEW MCLAIN VEAZEY** ------------------------------ knowingly engaged in monetary transactions through a financial institution, affecting interstate commerce, in criminally derived property worth more than $10,000.00.

21.     **VEAZEY** made the following transfer of funds from his Chase Bank personal checking account number XXXXX9270, via check, as payment for renovations

16

for his personal residence, such property having been derived from wire fraud, a specified

unlawful activity under Title 18, United States Code, Section 1956(c)(7)(A):

| Count | Approximate Date | Amount of Transfer |
|-------|------------------|--------------------|
| 22 | March 13, 2023 | $45,913.00 |

22.    **VEAZEY** made the following transfers of funds from his Chase Bank

personal checking account number XXXXX9270 as payments to American Express to pay

down **VEAZEY**'s credit card balance, such property having been derived from wire fraud,

a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(A):

| Count | Approximate Date | Amount of Transfer |
|-------|------------------|--------------------|
| 23 | July 11, 2023 | $44,878.84 |
| 24 | January 10, 2024 | $41,088.26 |
| 25 | April 11, 2024 | $93,126.71 |
| 26 | January 15, 2025 | $22,258.80 |
| 27 | August 6, 2025 | $12,872.86 |

All in violation of Title 18, United States Code, Section 1957(a).

## COUNT 28–31
### (Aggravated Identity Theft)

23.    The Federal Grand Jury incorporates paragraphs 1–5 and 7–17 by reference.

24.    On or about the dates listed below, in the Western District of Oklahoma,

----------------------------- MATTHEW MCLAIN VEAZEY, -----------------------------

during and in relation to wire fraud, a felony violation enumerated in Title 18, United States

Code, Section 1028A(c)(5), knowingly transferred, possessed, and used, without lawful

17

authority, the means of identification of another person, knowing that the means of identification belonged to another actual person:

| Count | Date | Means of Identification |
|-------|------|-------------------------|
| 28 | January 14, 2025 | Name of S.T. to impersonate S.T. in a screenshot of an email, as described in paragraph 16.B. |
| 29 | October 2, 2025 | Name of G.H. to impersonate G.H. in a screenshot of text messages, as described in paragraph 16.K. |
| 30 | October 23, 2025 | Name of J.P. to impersonate J.P. in a screenshot of text messages, as described in paragraph 16.M. |
| 31 | December 18, 2025 | Name of S.T. to impersonate S.T. in a screenshot of text messages, as described in paragraph 16.Q. |

All in violation of Title 18, United States Code, Section 1028A.

## FORFEITURE

The allegations contained in this Superseding Indictment are hereby re-alleged and incorporated for the purpose of alleging forfeiture.

Upon conviction of any of the offenses alleged in Counts 1 through 21 of this Superseding Indictment, **MATTHEW MCLAIN VEAZEY** shall forfeit to the United States any property real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

Upon conviction of any of the offenses alleged in Counts 22 through 27 of this Superseding Indictment, **MATTHEW MCLAIN VEAZEY** shall forfeit to the United States any property, real or personal, involved in such offense(s), or any property traceable to such property.

18

The property subject to forfeiture includes, but is not limited to:

a. a sum of money or money judgment equal to $2,385,500.00 representing the amount of cash proceeds obtained as a result of the offenses;

b. real property located at 14901 Aurea Lane, Oklahoma City, Oklahoma 73142, described more fully as:

Lot Twelve (12) in Block Twenty (20) of GAILLARDIA RESIDENTIAL COMMUNITY SECTION VI, an Addition to the City of Edmond, Oklahoma County, Oklahoma, according to the recorded plat thereof.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described above if, by any act or omission of defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(1); and Title 28, United States Code, Section 2461.

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

ROBERT J. TROESTER
United States Attorney

JACKSON D. ELDRIDGE
JULIA E. BARRY
Assistant United States Attorneys

20

5/5/26
_____
**DATE**

_____
**FOREPERSON OF THE GRAND JURY**

Under Fed. R. Crim. P. 6(c), this record is being filed with the Court Clerk and will not be made public unless the Court orders otherwise.